1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARLOS R. HARRIS,

          Petitioner,

    v.

RAUL LOPEZ, Warden,

          Respondent.

_____/

No. C 11-0533 PJH

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS AND
GRANTING CERTIFICATE OF
APPEALABILITY**

      Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C.
§ 2254, filed by state prisoner Carlos R. Harris ("Harris"). The court determines that the
matter is suitable for decision without oral argument and denies Harris's request for a
hearing. Docket Nos. 10, 23-2. Having reviewed the parties' papers and the record, and
having carefully considered the relevant legal authorities, the court DENIES the petition.

**BACKGROUND**

**A.    Procedural History**

      On September 16, 2005, in the Superior Court for the County of Santa Clara, a jury
found Harris and his codefendant, Eric McClain, guilty of attempted murder, assault with a
deadly weapon, and robbery in concert, and found true various firearm, deadly weapon,
and great bodily injury enhancements. That same day, Harris admitted having a prior
serious felony conviction and a prior strike conviction. On September 15, 2006, the trial
court sentenced Harris to 28 years and four months in state prison.

      On September 14, 2007, the court of appeal remanded the case for resentencing,
but otherwise affirmed the judgment. Answer, Ex. 7 (*People v. Harris*, No. H030677 (Cal.
App. September 14, 2007)). On November 28, 2007, the California Supreme Court denied
review.

United States District Court
For the Northern District of California

On remand, Harris filed a motion for new trial based on juror misconduct, as well as a motion to strike a prior strike conviction.  At the resentencing hearing on June 20, 2008, the trial court denied the motion for new trial on the ground that it lacked jurisdiction to hear the motion because of the limited scope of remand.  With respect to the motion to strike the prior conviction, the court heard oral argument and denied the motion.  The trial court resentenced Harris to 28 years and four months in prison, the same sentence it had originally imposed.  On December 7, 2009, the California Court of Appeal affirmed the judgment.  On February 10, 2010, the California Supreme Court denied review.

On February 3, 2011, Harris filed this pro se petition for writ of habeas corpus.  On February 16, 2011, Harris notified the court that he had retained counsel.  On March 2, 2011, the court ordered Harris to file a supplement to the petition to clarify the federal nature of the claims.  On May 16, 2011, counsel for Harris filed a supplement to his petition, clarifying the federal bases for his claims.  On June 14, 2011, the court dismissed Claims Four and Five on the ground that they presented issues of state law that were not cognizable in a federal habeas proceeding.  The court ordered respondent to show cause why the petition should not be granted as to Claims One, Two, Three, and Six. Respondent timely filed an answer to the petition, and Harris filed a traverse.

**B.    Factual Background**

The following factual summary of the offense is taken directly from the order of the court of appeal remanding the case for resentencing.  Ex. 7 at 2-4.[1]

Defendant and Eric McClain were good friends, and McClain had been staying at defendant's residence, with defendant and defendant's girlfriend Jocelyn Jasper, for a couple of weeks prior to September 6, 2004.  On September 6, 2004, Jocelyn Jasper's brother, Kenneth Jasper, brought his friend Crystal N. and a man named either Ben or Anthony to defendant's residence.  Defendant's friend Niiakwei Allotey was also visiting defendant.  Crystal told everyone that a man named Robert Carr had tried to rape her, and

---

[1]    Citations to the Administrative Record lodged by respondent are referred to herein by exhibit and page number.

United States District Court

For the Northern District of California

she wanted revenge.  She described Carr as a bookie and a drug dealer who had a nice vehicle, $15,000 or $20,000, drugs, and firearms.  The group, led by defendant, came up with a plan to lure Carr to San Jose and rob him.

The plan was for Crystal to bring Carr to a particular location at the Oakwood Apartments, where the men would be waiting.  One of the men was supposed to hold the dull side of a knife to Crystal's throat, and a second man was supposed to hold a gun on Carr.  A third man was supposed to "tape up" Carr with duct tape.  The plan became rather sketchy after that, but they seemed to expect to take Carr's vehicle and money.

McClain was given a loaded pistol and told that he would be the man holding the gun on Carr.  However, after McClain said "I can't use a gun," the gunman role was given to Allotey, and McClain was assigned to hold the knife to Crystal's throat.  Ben/Anthony was expected to "tape Robert Carr up" with duct tape.

Crystal telephoned Carr, invited him to San Jose and suggested that she would have sex with him.  Jocelyn Jasper got on the phone, pretended to be Crystal's aunt, and told Carr that he could spend the night at her place.  After spending a number of hours at defendant's residence, the group went to the Oakwood Apartments (where none of them, except possibly Allotey, were living) in the early evening and spent the evening partying in the various common areas at this large apartment complex.

Carr arrived around 12:45 a.m.  Crystal took Carr to a laundry room where the five men were waiting.  Allotey pointed the gun at Carr.  Carr knocked the gun out of Allotey's hand and tried to escape from the laundry room.  Defendant, McClain and Kenneth Jasper tried to stop Carr, while Allotey tried to retrieve the gun.  During this struggle, virtually all of Carr's clothing was torn off of his body, leaving him wearing just socks and one shoe.  A piece of duct tape was stuck to Carr's arm.  Allotey retrieved the gun.  Defendant took Carr's pants.

Although he lost his clothing, Carr managed to escape from the laundry room and began screaming for help.  McClain encountered Carr just outside the laundry room, and McClain stabbed Carr in the upper back and arm several times with a very large butcher

1  knife with an eight-inch blade.  Carr continued to scream for help, and McClain ran away

2  and threw the bloody knife in a garbage can.  Jocelyn Jasper was waiting in a car outside

3  the apartment complex, and she drove them away from the Oakwood Apartments.  The

4  entire incident lasted no more than 10 to 15 minutes from the time Carr arrived to the time

5  that the men reached the getaway car.

6       A citizen encountered Carr and called 911 at 1:06 a.m.  When Carr arrived at the

7  hospital about half an hour later, he was "near death," and had lost about half the blood in

8  his body.  He had multiple stab wounds to his chest and left arm.  Carr was

9  hospitalized for six days and would not have survived "without extraordinary medical

10  intervention."

11       McClain was arrested 10 days later.  Although he initially denied involvement, he

12  eventually admitted that he had stabbed Carr and described the incident to the police.

13  "[Carr] was screaming, 'Help, help, help' running out, running out, and I was froze, and, and

14  . . . [defendant] runs out and grabs dude; boom, like that, snap, and he's like 'E,' [McClain's

15  nickname] he's all, 'E, get him, E, get him.'  And he was like, 'Don't let him get away; don't

16  let that motherfucker get away.'  I fuckin', I fuckin' chase after him, fuckin' stab him."

17  McClain claimed that he "did not wanna kill him."  He stabbed Carr "'[c]ause I have no

18  choice, 'cause [defendant] told me to.  And if I didn't do it, . . . I didn't wanna find out the

19  consequences from [defendant]."

20                              **ISSUES PRESENTED**

21       Harris raises the following claims for federal habeas relief:

22        (1) that his Sixth and Fourteenth Amendment rights to a verdict by impartial,

23  indifferent jurors were violated because one of the jurors was a previous school teacher

24  with whom Harris had problems in school;

25       (2)  that his Sixth and Fourteenth Amendment rights to a fair trial and the effective

26  assistance of counsel were violated because the trial court denied Harris's motion for new

27  counsel;

28

*United States District Court*
For the Northern District of California

1    (3) that his Fifth, Sixth and Fourteenth Amendment rights to due process were

2    violated when the trial court instructed the jury that Jasper and Allotey were accomplices as

3    a matter of law; and

4    (4) that his Sixth and Fourteenth Amendment rights to the effective assistance of

5    counsel were violated when his attorney failed to file a timely motion to strike a prior

6    conviction at the time of sentencing.

7    **STANDARD OF REVIEW**

8    A district court may not grant a petition challenging a state conviction or sentence on

9    the basis of a claim that was reviewed on the merits in state court unless the state court's

10   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

11   unreasonable application of, clearly established Federal law, as determined by the

12   Supreme Court of the United States; or (2) resulted in a decision that was based on an

13   unreasonable determination of the facts in light of the evidence presented in the State court

14   proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to

15   mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),

16   while the second prong applies to decisions based on factual determinations, *Miller–El v.*

17   *Cockrell*, 537 U.S. 322, 340 (2003).

18   A state court decision is "contrary to" Supreme Court authority, that is, falls under

19   the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

20   that reached by [the Supreme] Court on a question of law or if the state court decides a

21   case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

22   *Williams (Terry)*, 529 U.S. at 412–13. A state court decision is an "unreasonable

23   application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it

24   correctly identifies the governing legal principle from the Supreme Court's decisions but

25   "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

26   federal court on habeas review may not issue the writ "simply because that court concludes

27   in its independent judgment that the relevant state-court decision applied clearly

28

5

United States District Court
For the Northern District of California

1  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

2  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

3         A state court's determination that a claim lacks merit precludes federal habeas relief

4  so long as "fairminded jurists could disagree" on the correctness of the state court's

5  decision.  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v.*

6  *Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s

7  unreasonable requires considering the rule's specificity.  The more general the rule, the

8  more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*  "As a

9  condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must

10  show that the state court's ruling on the claim being presented in federal court was so

11  lacking in justification that there was an error well understood and comprehended in

12  existing law beyond any possibility for fairminded disagreement." *Id.*

13         Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

14  determination will not be overturned on factual grounds unless objectively unreasonable in

15  light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340.

16  Review under § 2254(d)(1) is limited to the record that was before the state court that

17  adjudicated the claim on the merits.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

**ANALYSIS**

19  I.     **Juror Bias**

20         Harris contends that he was denied a fair trial by impartial jurors because one of the

21  jurors was his former school teacher with whom he previously had problems.  Harris

22  contends that this juror was biased and that the presence of this biased juror resulted in a

23  structural defect requiring a new trial.  Harris further requests an evidentiary hearing to

24  determine whether the juror was actually biased.

25        **A.     Standard**

26         The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of

27  impartial jurors.  U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "One

28  touchstone of a fair trial is an impartial trier of fact - 'a jury capable and willing to decide the

**United States District Court**
For the Northern District of California

6

United States District Court

For the Northern District of California

1   case solely on the evidence before it.'" *Fields v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007)

2   (en banc) ("*Fields II*") (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S.

3   548, 554 (1984)) (internal quotation marks omitted).  "Even if only one juror is unduly

4   biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."

5   *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted).  The

6   Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual

7   bias or implied bias, that is "bias in fact, or bias conclusively presumed as a matter of law."

8   *United States v. Gonzalez*, 214 F.3d 1109, 1111-12 (9th Cir. 2000).

9        However, the Constitution "does not require a new trial every time a juror has been

10  placed in a potentially compromising situation."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

11  The safeguards of juror impartiality, such as voir dire and protective instructions from the

12  trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or

13  influence that might theoretically affect their vote.  *Id.*  Due process only means a jury

14  capable and willing to decide the case solely on the evidence before it and a trial judge

15  ever watchful to prevent prejudicial occurrences and to determine the effect of such

16  occurrences when they happen.  *Id.*  Such determinations may properly be made at a

17  hearing.  *Id.*

18       **B.   Procedural Default**

19        Respondent challenges the juror bias claim on the ground of procedural default.

20  Under that doctrine, federal habeas review is barred for any claims dismissed by a state

21  court pursuant to a state procedural rule.  *Ybarra v. McDaniel*, 656 F.3d 984, 991 (9th Cir.

22  2011) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)), *cert. denied*, 133 S. Ct.

23  424 (2012).  "A state court's invocation of a procedural rule to deny a prisoner's claims

24  precludes federal review of the claims if, among other requisites, the state procedural rule

25  is a nonfederal ground adequate to support the judgment and the rule is firmly established

26  and consistently followed."  *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012).  The

27  procedural default rule is a specific application of the more general "adequate and

28

1    independent state grounds" doctrine.  *Coleman*, 501 U.S. at 729; *Wells v. Maass*, 28 F.3d

2    1005, 1008 (9th Cir. 1994).

3         Even if the state rule is independent and adequate, the claims may be reviewed by

4    the federal court if the petitioner can either show cause for the default and actual prejudice

5    as a result of the alleged violation of federal law, or demonstrate that failure to consider the

6    claims will result in a fundamental miscarriage of justice.  *Edwards v. Carpenter*, 529 U.S.

7    446, 451 (2000); *Coleman*, 501 U.S. at 749–50.  "Attorney error that constitutes ineffective

8    assistance of counsel is cause" for procedural default.  *Coleman*, 501 U.S. at 753-54.  In

9    certain circumstances, counsel's failure to preserve the claim for review in state court may

10   establish cause to excuse procedural default if the failure was so ineffective as to violate

11   the Constitution.  *Edwards*, 529 U.S. at 451.  *See also Martinez*, 132 S. Ct. at 1315, 1317

12   ("an attorney's errors during an appeal on direct review may provide cause to excuse a

13   procedural default") (citing *Coleman*, 501 U.S. at 754).

14        Here, after his case was remanded for resentencing, Harris filed a motion for a new

15   trial before the trial court, alleging juror bias.  The trial court denied the motion on the

16   grounds that it lacked jurisdiction because the case had been remanded "for the sole

17   purpose of re-sentencing" and that the trial court did not regain jurisdiction to entertain a

18   motion for a new trial, citing *People v. Smyers*, 2 Cal. App. 3d 666, 668 (1969) (holding that

19   trial court may not entertain motion for new trial on remand where appellate court "merely

20   orders a limited reversal and remand for sentencing or other post trial procedures").  Ex.

21   12B at 10.  The court of appeal affirmed the denial of the motion for new trial, holding that

22   "[a] new trial motion is not available after an appellate reversal of the original judgment that

23   remands the matter solely for resentencing."  Ex. 16 at 16.  The California Supreme Court

24   summarily denied the petition for review.  Ex. 18.

25        Respondent contends that the state court's denial of the motion for new trial for lack

26   of jurisdiction was based on an independent state law ground that is adequate to support

27   the judgment, and was firmly established and regularly followed at the time it was applied.

28   Answer at 4-5.  Harris does not dispute that the state procedural rule applied by the state

United States District Court

For the Northern District of California

8

United States District Court

For the Northern District of California

1    courts is an independent and adequate state ground.  Rather, he argues that any

2    procedural default was the result of ineffective assistance of counsel at trial and in his

3    original appeal.  Traverse at 3.

4            To prevent the procedural default doctrine from barring habeas review, Harris must

5    demonstrate both cause and prejudice.  For an ineffective assistance of counsel claim to

6    establish cause for procedural default, the claim must have been presented to the state

7    courts.  *Edwards*, 529 U.S. at 451.  By filing motions for appointment of new counsel before

8    the trial court and raising Sixth Amendment challenges on direct appeal, Harris is deemed

9    to have satisfied the requirement of presenting his ineffective assistance claims to the state

10   courts.  *See* Ex. 7 at 8-9.  However, to establish cause for the procedural default, Harris

11   must also show that the conduct of his attorney was ineffective under the standards of

12   *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Coleman*, 501 U.S. at 752.

13           Harris does not address the cause and prejudice standard to overcome procedural

14   default of his juror bias claim and thus there is no basis upon which the court can conclude

15   that Harris has met his burden of showing either.  However, assuming for the sake of

16   argument that there was ineffective assistance of counsel, either at trial or on direct appeal

17   as to this issue, and that that ineffective assistance was the cause of the procedural

18   default, Harris must also show prejudice, that is, he must demonstrate a "'reasonable

19   probability that, but for counsel's unprofessional errors, the result of the proceedings would

20   have been different.  A reasonable probability is a probability sufficient  to undermine

21   confidence in the outcome.'"  *Vansickel v. White*, 166 F.3d 953, 958-59 (9th Cir. 1999)

22   (applying *Strickland* prejudice standard to procedural default analysis)).  As discussed

23   below, the claim for juror bias fails on the merits and thus Harris fails to demonstrate a

24   reasonable probability that, but for counsel's error, the outcome of his case would have

25   been different.  Harris therefore fails to show prejudice sufficient to overcome the

26   procedural default.  *See Fairbank v. Ayers*, 650 F.3d 1243, 1257 (9th Cir. 2011) ("We need

27   not decide whether there is cause for the default because we conclude that Fairbank has

28   not shown the requisite prejudice" from the alleged prosecutorial misconduct in eliciting a

United States District Court

For the Northern District of California

1  racial slur made by the defendant, where race or racial animus was never advanced as a

2  factor in the conviction or sentence), *cert. denied*, 132 S. Ct. 1757 (2012).

3      **C.     Discussion**

4          As an initial matter, Harris argues that the bias of a single juror introduces a

5  structural defect that is not subject to harmless error analysis.  Am. Pet. at 7 (citing *Dyer v.*

6  *Calderon*, 151 F.3d 970, 973 n. 2 (9th Cir. 1998) (en banc)).  The Ninth Circuit, however,

7  rejected this contention in *Sims v. Rowland*, 414 F.3d 1148, 1152-53 (9th Cir. 2005), noting

8  that "no Supreme Court precedent holds that a failure to investigate potential juror bias

9  presents structural error, and even if we were to read *Dyer* to address potential juror bias, it

10  would be insufficient authority under AEDPA."  The court in *Sims* held that federal law is not

11  clearly established as to whether a hearing is required whenever evidence of juror bias is

12  brought to light.  *Id.* at 1156.  In *Tinsley v. Borg*, the court of appeals stated that a proper

13  remedy for "allegations of juror partiality is a post-trial hearing in which the defendant has

14  the opportunity to prove bias," but recognized that "[t]he Constitution 'does not require a

15  new trial every time a juror has been placed in a potentially compromising situation.'"  895

16  F.2d at 524 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

17          Harris proceeds on the theory of actual juror bias, "which stems from a pre-set

18  disposition not to decide an issue impartially."  *Fields II,* 503 F.3d at 766.  The record on

19  this issue is sketchy at best.  At an in camera hearing on his post-conviction *Marsden*[2]

20  motion, Harris disclosed his concern to the trial court about bias with respect to Juror No. 8,

21  who he believed was one of his former school teachers.  Ex. 3C at 2137.  Harris told the

22  trial court that after he informed his trial attorney that he knew this juror, the attorney told

23  him that the juror "would just claim that she didn't remember me."  *Id*.  Harris argued that "I

24  still feel that it should have been brought up to the courts.  It should have been brought up."

25  *Id*.  Harris also reported telling his attorney, "I'm not a racist or anything like that.  I said I

26  hope you face my fears.  I don't see one black lady on the stand.  And basically, he was

27

28      [2]      *See People v. Marsden*, 2 Cal.3d 118 (1970).

10

United States District Court
For the Northern District of California

1   saying, well, this is the best jury we are going to get.  And it was a long process.  And I

2   understand that everybody wanted to get off it, but it wasn't fair.  You know, it wasn't fair to

3   me, and it just wasn't fair." *Id.*   Responding to Harris's contentions, his trial attorney only

4   stated, "Regarding the jurors, the pool was limited as to any African-American jurors that's

5   prominent in Santa Clara County.  I did the best I could with jury selection.  I'll just leave it

6   at that." *Id.* at 2151.

7         The trial court did not make specific findings about Harris's allegations that his

8   attorney was negligent in failing to raise the issue of potential juror bias, but denied Harris's

9   post-conviction motion for appointment of new counsel for sentencing. Ex. 3C at 2175.

10  On federal habeas review, challenges to purely factual questions resolved by the state

11  court are reviewed under § 2254(d)(2).  "[T]he question on review is whether an appellate

12  panel, applying the normal standards of appellate review, could reasonably conclude that

13  the finding is supported by the record." *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir.

14  2004).  Here, the state courts did not make a finding about juror bias to which the court

15  owes deference on habeas review.  *See Fields v. Woodford*, 309 F.3d 1095, 1106 ("*Fields

16  I*"), *amended*, 315 F.3d 1062 (9th Cir. 2002)*.*

17        Under controlling state law, the trial court was required to resolve the question

18  whether an individual verdict must be overturned for jury misconduct or irregularity "by

19  reference to the substantial likelihood test, an objective standard." *In re Hamilton*, 20 Cal.

20  4th 273, 296 (1999).  Under that standard, "[a]ny presumption of prejudice is rebutted, and

21  the verdict will not be disturbed, if the entire record in the particular case, including the

22  nature of the misconduct or other event, and the surrounding circumstances, indicates

23  there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or

24  more jurors were actually biased against the defendant." *Id.*  "The standard is a pragmatic

25  one, mindful of the day-to-day realities of courtroom life." *Id.* (citation and quotation marks

26  omitted).

27        Harris alleges in his briefs that Juror No. 8 was his former high school teacher, and

28  that she was involved in him being expelled or otherwise disciplined in high school.  He

United States District Court

For the Northern District of California

1   does not, however, support this allegation with even his own declaration and he provides

2   no details about the nature of her involvement (did she initiate his discipline or merely

3   oversee it in some administrative capacity?) or the nature of his discipline (was he expelled

4   or not, and if so, for what?).  Even assuming that Juror No. 8 was formerly Harris's teacher

5   and that she was somehow involved in some disciplinary action taken against Harris in high

6   school sometime in the mid-1980s,[3] this fact would not support a substantial likelihood that

7   she harbored actual bias against him nearly 20 years later when he was an adult on trial for

8   attempted murder, assault with a deadly weapon, and robbery in concert, even assuming

9   that she remembered him.[4]   Harris does not point to any evidence at trial referring to his

10  conduct in high school, much less his disciplinary record, nor does he identify any

11  similarities between his problems in high school and the crimes for which he was convicted.

12  It is not reasonable to infer, without substantially more detail than has been provided by

13  Harris, that Juror No. 8's unspecified actions as a school teacher toward him as a high

14  school student almost two decades before, would prevent her from impartially deciding the

15  issues presented at his trial.  *See United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir.

16  2000) ("actual bias is 'bias in fact' - the existence of a state of mind that leads to an

17  inference that the person will not act with entire impartiality") (citations and quotation marks

18  omitted).

19       Harris also fails to show any basis for implied juror bias, which requires a

20  determination "whether an average person in the position of the juror in controversy would

21  be prejudiced."  *Id.*  Under the doctrine of implied bias, "prejudice is to be presumed where

22  the relationship between a prospective juror and some aspect of the litigation is such that it

23  is highly unlikely that the average person could remain impartial in his deliberations under

24

25       [3]  *See* Friedman Declaration in Support of Request for Evidentiary Hearing ¶ 2.    In
26  support of his habeas petition, Harris has submitted an excerpt of his 1984 high school
    yearbook which purports to identify the juror in question. Am. Pet., Ex. 3 at 201.

27       [4]   The evidence in the record shows that Harris's date of birth was December 7, 1970,
28  making him 34 years old when he was tried and convicted in state court in August through
    September 2005.  Ex. 1D at 864.

United States District Court

For the Northern District of California

1    the circumstances." *Id.* (citations and quotation marks omitted).  Harris has not

2    demonstrated that his relationship with his former high school teacher presented "potential

3    for substantial emotional involvement, adversely affecting impartiality, inherent in certain

4    relationships," or other extraordinary circumstances that would support a presumption of

5    bias. *Tinsley*, 895 F.2d at 527.  *Cf. Fields I*, 309 F.3d at 1106 (ordering evidentiary hearing

6    on juror bias where juror's wife was the victim of a crime similar to the charges against the

7    petitioner).

8         **D.      Request for Evidentiary Hearing**

9         Harris requests an evidentiary hearing on his juror bias claim.  "A court confronted

10   with a colorable claim of juror bias must undertake an investigation of the relevant facts and

11   circumstances." *Dyer*, 151 F.3d at 974 (citations omitted).  *See also Davis v. Woodford*,

12   384 F.3d 628, 652-53 (9th Cir. 2004).  The Ninth Circuit has recognized, however, that

13   clearly established federal law, as determined by the Supreme Court, does not require

14   state or federal courts to hold a hearing every time a claim of juror bias is raised by the

15   parties. *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003).  *See also Estrada v.*

16   *Scribner*, 512 F.3d 1227, 1241 (9th Cir. 2008) (district court did not abuse its discretion in

17   declining to hold hearing on juror bias where state court's determination was not

18   unreasonable in finding two jurors were not actually biased, and that juror bias could not be

19   presumed based on jurors' honesty during voir dire); *Sims*, 414 F.3d at 1153 (trial court

20   need not order a hearing sua sponte whenever presented with evidence of juror bias).

21        Harris has not provided any facts to support a colorable claim of juror bias.  As noted

22   above, Harris did not provide an affidavit with any details about his previous encounters

23   with the juror in question.  Rather, in support of his request for an evidentiary hearing,

24   Harris's habeas counsel has submitted a declaration representing counsel's belief that the

25   person believed to be Juror No. 8, P.H., was involved in Harris being expelled, or otherwise

26   disciplined, in high school.  Doc. no. 9 ¶  2.  Habeas counsel attests that an investigator

27   contacted Ms. H. on May 15, 2011.  *Id.*  The investigator reported that Ms. H. told him that

28   she worked at Harris's high school from 1972 to 2006, when she retired, and recalled

United States District Court

For the Northern District of California

1   performing jury duty in 2005.  However, Ms. H. did not recall the facts of the case and had

2   no memory of Harris either from the trial or from school.  Harris's counsel suggests that in

3   light of the highly peculiar facts involved in Harris's attempted murder conviction, it is

4   unlikely that Ms. H. would not remember the nature of the charges or who the defendant

5   was in the trial.  Doc. no. 9 ¶ 2.  Such speculative suspicions are not sufficient to warrant a

6   fishing expedition for the possibility of uncovering a former juror's bias where there is no

7   basis to infer that this juror was biased by defendant's status as her former student nearly

8   20 years before he was on trial.

9        Harris has offered no facts about the extent of his contacts with Ms. H. when Harris

10  attended the school where she taught, and he has shown no connection between his

11  school disciplinary record and the charges on which he was tried and convicted to suggest

12  that Ms. H. was improperly influenced.  Nor does Harris suggest that Ms. H. concealed any

13  bias on voir dire, particularly where the record indicates that Harris himself did not

14  recognize Ms. H. as his former teacher until sometime after the trial had started.  *See* Ex.

15  3C at 2137.  In his declaration, Harris's habeas counsel questions the credibility of Ms. H.

16  when she claimed to his investigator in 2011 that she had no recollection of Harris either

17  from high school or from the trial.  The only records of the trial voir dire and jury selection

18  are the clerk's minutes dated August 23, 24, 25, 26 and 29, 2005.  Ex. 1A at 394-409.

19  Even though the transcript of the trial voir dire is not part of the habeas record and thus

20  cannot support any findings in this regard, it seems likely that the trial court asked

21  prospective jurors whether they knew the defendant and it also seems likely that Ms. H.'s

22  employment at Harris's former high school would have been known during jury selection.

23  Yet Harris did not recognize Ms. H. until apparently later in the trial.

24       Harris offers yearbook photos dated 1984 and 2001 to show that Ms. H. was a staff

25  member at Yerba Buena High School.  Am. Pet, Ex. 3 at 199-204.  Although Harris omits

26  any contemporaneous yearbook photos of himself to show that he attended the same

27  school where Ms. H. taught, he provides evidence which demonstrates that Harris

28  completed 11th grade at Yerba Buena High School.  Am. Pet., Ex. 3 at 181.  Even assuming

United States District Court

For the Northern District of California

1   that Ms. H. was Harris's former teacher and was involved in some unspecified way with

2   disciplinary action against him, any such interaction would have occurred about 16 to 20

3   years before Harris was tried for underlying offense.  As previously stated, in view of this

4   long lapse of time, and without any factual basis offered by Harris to determine the nature

5   and extent of contact between himself and Ms. H, these extrinsic facts do not support a

6   colorable claim of juror bias, and the request for an evidentiary hearing is, therefore,

7   denied.

8   **II.    Denial of Motion for New Trial Counsel**

9        Harris contends that the trial court's denial of his *Marsden* motion to substitute

10  counsel prior to trial violated his Sixth Amendment right to the effective assistance of

11  counsel and right to a fair trial.  As discussed below, this claim does not merit habeas relief.

12       **A.    Right to Effective Assistance of Counsel**

13       The Ninth Circuit has recognized that "it is well established and clear that the Sixth

14  Amendment requires on the record an appropriate inquiry into the grounds for such a

15  motion, and that the matter be resolved on the merits before the case goes forward."

16  *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000).  On a claim that the state court's

17  denial of a motion to substitute counsel violated the defendant's right to effective

18  assistance, "the basic question is simply whether the conflict between [the defendant] and

19  his attorney prevented effective assistance of counsel." *Id.* at 1026.  "However, not every

20  conflict or disagreement between the defendant and counsel implicates Sixth Amendment

21  rights." *Id.*  To obtain habeas relief, Harris must show that the conflict between him and his

22  attorney "had become so great that it resulted in a total lack of communication or other

23  significant impediment that resulted in turn in an attorney-client relationship that fell short of

24  that required by the Sixth Amendment." *Id.*

25       Here, the trial court held an in camera hearing on Harris's pretrial *Marsden* motion,

26  as well as his post-conviction *Marsden* motion, at which Harris informed the court that he

27  was not satisfied with his attorney's lack of communication and the investigation and

28  handling of the case.  Ex. 3A at 18-30.  Harris and his attorney, Schroeder, each addressed

the trial judge's concerns.  The court of appeal reviewed the administrative record of the

*Marsden* proceedings and found as follows:

> Defendant affirmed that Schroeder had assured him that he would "represent me to the best that he could," but defendant was concerned that no motions had been filed and "I don't even know the strategy."  Defendant expressed concern that Schroeder was "busy" and "has other things to do" than his case.  He complained that he had seen Schroeder six times in the last year.  Defendant was disappointed that Schroeder had not insisted on a line-up.  Defendant criticized the frequency and "level" of communication between him and Schroeder.  Defendant said his relationship with Schroeder had "broken down" so that he no longer trusted or could communicate with Sch[r]oeder.

> After defendant had been given the opportunity to fully state his concerns, the court asked Schroeder to respond.  Schroeder, who had been practicing criminal law for over 30 years, explained that, for strategic reasons, he did not want there to be a line-up, and he noted that Carr had been unavailable for a line-up anyway.  Even if Carr had been available and had failed to identify defendant in a line-up, Schroeder felt that this would not be helpful to defendant's case, and the risk that Carr would identify defendant weighed strongly against seeking a line-up.  Schroeder had investigated the case and, except for one person, had been unable to locate any alibi witnesses.  All of the other witnesses to the crimes were defendant's codefendants, and Schroeder could not speak to them directly because they were represented by counsel.  Schroeder had investigated other potential witnesses, nearly all of whom were in jail and represented by counsel.

> Schroeder had tried to convince defendant to waive time so that there would be more opportunity for investigation, but defendant had adamantly refused until it was too late.  Schroeder acknowledged defendant's concerns, and he affirmed that he would "do the best I can to make him decide that he was incorrect in his feeling" that Schroeder was not performing adequately.  No motions had been filed because there were no motions to bring.  Schroeder was "working feverishly" to prepare for trial.

> The court then allowed defendant to respond to Shroeder's statements. Defendant asked if "Mr. Schroeder can get like a couple weeks or something like that so he can get out and talk to these people because it's real vi[tal] to my case."  This prompted Schroeder to ask the court to continue the case for two weeks so that he could do additional investigation. Schroeder explained that this additional investigation was necessitated by the change in circumstances arising from the codefendants, other than McClain, recently having chosen to enter into plea agreements and testify for the prosecution. The court advised Schroeder to make his continuance request in open court.

> The court denied defendant's *Marsden* motion.  "I don't feel that there's been a substantial showing that Mr. Schroeder has not or cannot provide adequate counsel for you and representation in this

case.  I'm also not convinced that the two of you have reached a point that you are at each other's throat about what's going on that this is going to reflect and require there to be ineffective representation in the future."  At this point, defendant interjected "Right."  The court went on.  "So dealing with Mr. Schroeder in the past I know he's willing to talk to you, and you're willing to talk to him, and I've actually seen you communicate right here and I think that's important."  Defendant responded "Right. Right."  The court told defendant "[y]ou always have a right, if you feel something is wrong, to bring to my attention through your attorney and I'll listen to you."  Defendant said "Okay."

Ex. 7 at 6-7.  The court of appeal upheld the denial of the pretrial *Marsden* motion, finding that the record did not support Harris's claim that "'it is clear that the attorney-client relationship had irretrievably broken down' to the point that he 'did not trust' Schroeder and 'they simply could no longer work together effectively.'"  Ex. 7 at 8-9.  The court of appeal held as follows:

Defendant made it clear at the outset that he had "a whole lot" of respect for Schroeder and thought well of him.  Defendant's primary concern was his belief that Schroeder had not had enough time to devote to this case and had not been able to complete his investigation.  Schroeder explained that he had done a substantial amount of investigation, and he had tried to convince defendant to waive time so that there would be more time for investigation of the case.  Schroeder was working very hard on the case, and he assured defendant that he would do his best.  Defendant reacted favorably to Schroeder's explanation and did not dispute it.  Instead of urging the court to relieve Schroeder and appoint new counsel, defendant asked the court to give *Schroeder* more time to investigate the case, and Schroeder told the court that he would seek a continuance for that purpose.  When the court denied defendant's *Marsden* motion and explained that it was finding that defendant and Schroeder were able to communicate effectively, defendant interjected his agreement.

Schroeder's explanation of his efforts adequately demonstrated that he was providing effective assistance to defendant. Since nothing other than defendant's pro forma statement indicated that there was an unresolvable conflict between defendant and Schroeder, and defendant expressly indicated that he was willing to have Schroeder continue to work on his case and that he was able to communicate with Schroeder, the trial court did not abuse its discretion in concluding that the attorney-client relationship had not irredeemably broken down.

Ex. 7 at 9.  The state court's denial of Harris's motion to substitute counsel was not contrary to, or an unreasonable application of, clearly established federal law.  After review of the

17

United States District Court

For the Northern District of California

1    record, the state court of appeal reasonably concluded that the record supported the trial

2    court's findings that Harris and his attorney were able to communicate effectively and that

3    the attorney was providing effective assistance.  *See* Ex. 3A at 54.  The state court found

4    that trial counsel had done a substantial amount of investigation and worked very hard on

5    the case, and concluded that he had provided effective representation.  Ex. 7 at 9.

6    Although Harris expressed a dissatisfaction with the attorney's tactics, the state court

7    reasonably held that the record did not support a finding that the relationship had

8    irredeemably broken down.  *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007)

9    ("Disagreements over strategical or tactical decisions do not rise to level of a complete

10   breakdown in communication.").  Therefore, Harris is not entitled to habeas relief on this

11   Sixth Amendment claim.

12        **B.     Right to Counsel of Choice**

13        Harris also contends that he was denied the right to counsel of his choice.  During

14   the pretrial *Marsden* hearing, Harris asked the trial court to substitute his lawyer with

15   another attorney with whom he had discussed the case but had not formally retained.[5]  Ex.

16   3A at 18-20.  The Ninth Circuit has recognized, however,  that "[t]he Sixth Amendment

17   guarantees criminal defendants the right to effective representation, but indigent

18   defendants do not have a constitutional right to be represented by their counsel of choice."

19   *Gonzalez v. Knowles*, 515 F.3d 1006, 1012 (9th Cir. 2008) (citing *Caplin & Drysdale,*

20   *Chartered v. United States*, 491 U.S. 617, 624 (1989)); *Schell*, 218 F.3d at 1025 ("The

21   qualified right of choice of counsel applies only to persons who can afford to retain

22   counsel.").  As discussed above, Harris's contention that he had a "strained, difficult

23   relationship" with his attorney does not rise to the level of ineffective assistance of counsel.

24   Am. Pet. at 11.  As the court held in *Gonzalez*, "the Sixth Amendment encompasses no

25   _____

26        [5]     As the court of appeal found, Harris filed another *Marsden* motion in December
27   2005, after the jury verdicts were returned in September 2005, but Harris did not contend on
     appeal that the trial court erred in denying the postconviction *Marsden* motion.  *See* Ex. 7 at
28   5 n.4.  Harris's chosen attorney, Welch, substituted in as defense counsel in February 2006.
      *Id.*

1    guarantee of a 'meaningful attorney-client relationship.'"   515 F.3d at 1012 (quoting *Morris*

2    *v. Slappy*, 461 U.S. 1, 13 (1983)).   Because Harris was appointed an attorney who the trial

3    court reasonably determined was competent, no Sixth Amendment violation occurred as a

4    result of the trial court's denial of his motion to substitute counsel.

5         **C.    Right to Fair Trial**

6         Harris contends that the state court's denial of his *Marsden* motion violated his right

7    to a fair trial because he was denied the ability to present a defense.   Am. Pet. at 12.

8    Harris does not articulate a basis for this claim that is distinct from the claim based on his

9    right to effective assistance of counsel.   Having determined that the denial of effective

10   assistance claim is without merit, the court denies relief for the claim that Harris was denied

11   a fair trial based on denial of the *Marsden* motion.

12   **III.    Jury Instruction Concerning Accomplices**

13        Harris claims that his right to due process was violated when the trial court instructed

14   the jury that Jocelyn Jasper and Allotey were accomplices as a matter of law.

15        **A.    Background**

16        The court of appeal summarized the relevant factual background as follows:

17             The trial court instructed the jury on the need for corroboration
         of accomplice testimony and instructed the jury to view accomplice
18             testimony with caution.   The court also instructed the jury regarding
         who could be considered an accomplice.   "Merely assenting to or
19             aiding or assisting in the commission of a crime without knowledge of
         the unlawful purpose of the perpetrator and without the intent or
20             purpose of committing, encouraging, or facilitating the commission of
         the crime is not criminal.   Thus, a person who assents to, or aids, or
21             assists in, the commission of a crime without the knowledge and
         without the intent or purpose is not an accomplice in the commission of
22             the crime.   [¶] If the crimes charged in the information were
         committed by anyone, the witnesses Jocelyn Jasper and Niiakwei
23             Allotey were accomplices as a matter of law, and their testimony is
         subject to the rule requiring corroboration."

24
             Defendant's trial counsel argued that Jocelyn Jasper had lied to
25        protect her brother Kenneth Jasper, and both Jocelyn Jasper and
         Allotey had lied to obtain the benefits of their plea agreements with the
26        prosecution.   He specifically asked the jury to distrust their testimony
         and expressly referenced the accomplice instructions.

27
     Ex. 7 at 10.   *See* Ex. 2L at 1934.
28

**United States District Court**
For the Northern District of California

1

**B.    Standard**

2     To obtain federal habeas relief for instructional error, a petitioner must show that the

3  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

4  process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141,

5  147 (1973).  *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("it must be

6  established not merely that the instruction is undesirable, erroneous or even 'universally

7  condemned,' but that it violated some [constitutional right]") (citation and quotation marks

8  omitted).  The instruction may not be judged in artificial isolation, but must be considered in

9  the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.

10  In other words, the court must evaluate jury instructions in the context of the overall charge

11  to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152,

12  169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843

13  F.2d 314, 317 (9th Cir. 1988).  *See also Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004)

14  (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on

15  imperfect self-defense defining "imminent peril" where three other instructions correctly

16  stated the law).  If an error is found, the court also must determine that the error had a

17  substantial and injurious effect or influence in determining the jury's verdict, *Brecht v.*

18  *Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  *See*

19  *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

20

**C.    Discussion**

21     Harris argues that by instructing the jury that "if the crimes charged in the information

22  were committed by anyone," then the witnesses Jocelyn Jasper and Allotey "were

23  accomplices as a matter of law," the trial court did not require the jury "to decide the

24  dispositive factual issue in the case, i.e., whether Petitioner truly was their accomplice."

25  Am. Pet. at 12-13.  Harris argues that because the jury was essentially told that he was

26  Jasper and Allotey's accomplice, the jury was instructed that he was guilty.  *Id.* at 13, 16.

27  Harris further argues that multiple crimes were charged in the information against two

28  separate defendants, namely Harris and Eric McClain, and that while the charges against

20

United States District Court

For the Northern District of California

1   the two defendants were the same, the allegations were different.  Traverse at 8.  Harris

2   argues that the jury was instructed that Jocelyn Jasper and Allotey were accomplices if it

3   found that at least some of the crimes were committed by either defendant, but was not

4   instructed to clarify that Jasper and Allotey were accomplices only of the defendant who

5   committed the crime.  Thus, Harris argues, the instruction was confusing and lightened the

6   People's burden to show that Jasper and Allotey were accomplices of Harris, rather than of

7   McClain.  Traverse at 8.  Harris contends that the jury instruction should have explicitly

8   stated that Jasper and Allotey were accomplices only of the individual defendant whom it

9   found to have committed a crime.  *Id.*

10      The court of appeal expressly rejected these arguments on direct review of the

11  judgment, finding that "there was no danger that the jury would interpret the instruction as

12  imputing to defendant the guilt of Jocelyn Jasper and Allotey."  Ex. 7 at 11.  Citing *People v.*

13  *Williams*, 17 Cal. App. 2d 122 (1936), the court of appeal held that "'no word of instruction'

14  here told the jury that Jocelyn Jasper or Allotey was the accomplice of *this defendant*.  The

15  instruction left open *who* the jury might conclude Jocelyn Jasper and Allotey were the

16  accomplices of."  Ex. 7 at 11-12.  In concluding that the jury could not have drawn an

17  adverse inference from the instruction against Harris, the court of appeal reasoned that

18  because Eric McClain admitted his participation in the assault and robbery, it was

19  "undisputed that Jasper and Allotey were, at the very least, McClain's accomplices."  Ex. 7

20  at 12.  The court of appeal held that "whether they were also accomplices to defendant was

21  left to the jury to determine."  *Id.*  Because the accomplice instruction was conditional ("if

22  the crimes charged in the information were committed by anyone"), the court of appeal

23  found that the instruction "was not directed at defendant unless the jury found that he

24  participated in the offenses," and was not erroneous.  *Id.*

25      In reviewing an ambiguous instruction on a federal habeas claim, the inquiry is not

26  how reasonable jurors could or would have understood the instruction as a whole; rather,

27  the court must inquire whether there is a "reasonable likelihood" that the jury has applied

28  the challenged instruction in a way that violates the Constitution.  *See Estelle*, 502 U.S. at

72 & n.4.  In the context of all the instructions given to the jury, the jury was charged to determine whether Harris and/or Eric McClain had committed any of the crimes charged in the information.  *Id.* at 72.  As to each count, the trial court set out the elements of each crime that "must be proved."  *See* Ex. 2L at 1936-43 (instructing jury on counts one through three of the information).

Harris argues that the erroneous instruction was made more confusing to the jury by the prosecutor's statement during closing argument that "Jocelyn Jasper and Mr. Allotey are accomplices to these crimes as a matter of law. . . .  They came in here and told you they committed the crime.  They participated in the crime with these two defendants." Traverse at 9; Ex. 2L at 1953.  In introducing closing arguments, however, the trial court instructed the jury that "the attorneys . . . can ask you to draw reasonable inferences from the evidence. . . . Because you are the triers of facts, I will leave that totally up to you as to whether or not what they are arguing to you is reasonable or not."  Ex. 2L at 1949. Considered in the context of the instructions as a whole and the trial record, the absence of an explicit instruction that Jasper and Allotey were accomplices only of the defendant or defendants who were found to have committed a crime was not reasonably likely to have resulted in the jury imputing guilt to a defendant that it did not find to have committed a crime.  As the court of appeal reasoned, the accomplice instruction was conditional and did not instruct the jury to find that Jasper and Allotey were Harris's accomplices even if it found that Harris had not participated in the crimes. Ex. 7 at 12.  Harris has not demonstrated a reasonable likelihood that the jury applied the accomplice instruction in a way that violated his right to due process or to a fair trial.  The state court's ruling was neither contrary to, nor an unreasonable application of, clearly established federal law.

**IV.    Sentence**

At resentencing, the trial judge considered and denied Harris's *Romero*[6] motion to strike his prior conviction, by entry of a plea in 1992, for discharging a firearm in a grossly

---

[6]     *People v. Superior Court (Romero)*, 13 Cal.4th 497 (1996).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

negligent manner in violation of California Penal Code section 246.3.  Harris raises an ineffective assistance of counsel claim challenging his trial attorney's failure to file a *Romero* motion at the time of original sentencing.

Harris also contends that the sentencing judge failed to understand the scope of his discretion at resentencing by denying the *Romero* motion and imposing the same sentence that was reversed by the court of appeal.  Am. Pet. at 18.  To the extent that Harris challenges the trial court's sentencing decision as an abuse of discretion, that challenge is made under state law and does not present a cognizable federal habeas claim.  *See* Order to Show Cause, filed June 14, 2011.

**A.   Background**

The court of appeal summarized the factual background of Harris's prior strike conviction as follows:

> Defendant's strike prior arose from a November 1991 incident that occurred when defendant was 20 years old.  Defendant fired a .22 caliber rifle at the second-story window of a home in which he knew people were present.  He missed, but the residents fled the house.  Defendant and his compatriot then broke into the home, and defendant smashed two glass coffee tables inside the house.  Defendant denied that he had intentionally fired the rifle at the house.  He was originally charged with shooting at an occupied building (Pen. Code, § 246), but he entered a negotiated plea of guilty to discharging a firearm in a grossly negligent manner (Pen. Code, § 246.3) in exchange for dismissal of the more serious charge.  A violation of Penal Code section 246.3 is a serious felony (Pen. Code, § 1192.7, subd. (c)(7)), which qualifies it as a strike.

> At the time he committed the 1991 offense, defendant was on parole from the California Youth Authority (CYA).  He had been committed to the CYA after juvenile adjudications for burglary and assault.  Before he was committed to the CYA, defendant had been committed to the Ranch, from which he had twice escaped.  Although he was just 20 years old at the time of the strike prior, defendant had already accumulated adult misdemeanor convictions for petty theft and furnishing false identification to a peace officer.  Nevertheless, his punishment for the strike prior was lenient; he was granted probation conditioned on a year in jail, with execution of a two-year prison term suspended.  Defendant did not do well on probation.  He violated his probation.  He was sent back to jail for six months, and his term of probation was extended to September 1995.

> Defendant ultimately completed his probation for the strike prior, but he continued his criminal career.  In October 1998, defendant was found in possession of cocaine.  He was charged by

information with possession of a controlled substance (Health & Safety Code, §§ 11350, subd. (a)), and his 1991 prior conviction was alleged as a strike prior.  Defendant pleaded guilty to the possession count.  In September 2000, the court granted his *Romero* motion in the possession case and struck the strike prior.  Defendant was granted probation conditioned on a year in jail.

Defendant's felony possession conviction was not his only significant crime between the commission of his strike prior and the current offenses.  Defendant also suffered convictions in 1999 for misdemeanor spousal battery and false imprisonment.  He was placed on probation and violated his probation.  When he committed the current offenses in September 2004, defendant remained on probation for the 1999 offenses.  In all, defendant had suffered a total of at least 12 misdemeanor convictions and two felony convictions before he committed the current offenses.

Ex. 16 at 10-11.

**B.    Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*

In order to prevail on an ineffectiveness of counsel claim, petitioner must satisfy the two-pronged test set forth in *Strickland.*  First, petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  If a petitioner cannot establish that defense counsel's performance was deficient, it is unnecessary for a federal court considering an ineffective assistance habeas claim to address the prejudice prong of the *Strickland* test.  *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

United States District Court

For the Northern District of California

1    The *Strickland* framework for analyzing ineffective assistance of counsel claims is

2 considered to be "clearly established Federal law, as determined by the Supreme Court of

3 the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *Cullen*, 131 S. Ct. at

4 1403.  A "doubly" deferential judicial review is appropriate in analyzing ineffective

5 assistance of counsel claims under § 2254.  *See id.* at 1410–11; *Harrington*, 131 S. Ct.

6 770, 788 (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same).  The general rule of

7 *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the

8 state courts greater leeway in reasonably applying that rule, which in turn "translates to a

9 narrower range of decisions that are objectively unreasonable under AEDPA."  *Cheney v.*

10 *Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S.

11 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions

12 were reasonable.  The question is whether there is any reasonable argument that counsel

13 satisfied *Strickland*'s deferential standard."  *Harrington*, 131 S. Ct. at 788.

14    **C.    Discussion**

15    Harris contends that trial counsel failed to move to strike his prior conviction at the

16 time of his original sentencing, and that a *Romero* motion was not filed until after remand

17 for resentencing.  Harris points out that the trial court, at resentencing, noted that a ruling

18 on the *Romero* motion was "probably appropriate and probably should have been done the

19 first time around."  Am. Pet. at 20; Ex. 12B at 14.  The trial court noted that the State did

20 not object to consideration of the *Romero* motion on remand, and held that even under the

21 limited scope of remand, the motion to strike the prior conviction came within the trial

22 court's discretion.  Ex. 12B at 13-14.

23    Respondent contends that Harris failed to exhaust his ineffective assistance claim by

24 failing to raise it in either the court of appeal or the California Supreme Court.  Answer at

25 14.  Respondent argues that Harris challenged the sentence on appeal for abuse of

26 discretion, but did not raise the ineffectiveness claim.  *Id.*  Harris does not demonstrate that

27 he presented the ineffective assistance claim in state court, nor does he address the

28 question whether he failed to exhaust this claim.  Nonetheless, the court determines that

United States District Court

For the Northern District of California

1    Harris has not raised "even a colorable federal claim" for ineffective assistance, and denies

2    relief on the merits of the claim.  *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005);

3    28 U.S.C. § 2254(b)(2).

4            Harris has not demonstrated prejudice from trial counsel's failure to file the *Romero*

5    motion because he fails to show that it is reasonable that the court would have granted the

6    motion to strike the prior conviction.  At resentencing, the trial court reviewed the briefs and

7    took oral argument on Harris's *Romero* motion, and considered that in 1999, another state

8    court judge struck the prior felony conviction when Harris was accused of possession of

9    narcotics.  Ex. 12B at 15-23.  The court also reviewed the original presentence report

10   prepared by a probation officer and a psychological evaluation by a defense psychologist.

11   *Id.* at 14-15.  After considering the "facts and circumstances of that prior conviction [and] of

12   the present offense [ ] and also considering Mr. Harris's future prospects based on the

13   decision [on the motion to strike]," the sentencing court denied Harris's motion to strike the

14   prior conviction.  *Id.* at 24.  That court considered Harris's argument that the prior conviction

15   occurred a long time before, in 1992, but noted that Harris had been involved in the criminal

16   justice system several times since then, such that "it's not like [the present offense] was the

17   exception to the rule."  *Id.*  The sentencing judge also noted that the prior conviction

18   involved the use of a firearm that was fired, and that having heard the evidence in the

19   present case, he had "not a doubt in my mind that Mr. Harris was the ring leader . . . of an

20   assault that resulted in someone coming within, [as the prosecutor described,] a thimbleful

21   of blood of coming within death.  *Id.* at 25.  The court also found that Harris's future

22   prospects were "dismal" and "would depend upon initial[ly] taking responsibility for what he

23   did [and] he's never done that."  *Id.*  Having observed Harris take the stand at his trial, the

24   sentencing judge concluded that Harris had lied to the jury and tried to fabricate evidence,

25   supporting the court's assessment that "the present case is as serious as it possibly can

26   get."  *Id.* at 26.  The sentencing court concluded that Harris's case "comes within the spirit

27   of the Three Strikes Law, it's exactly what the Three Strikes Law seeks to deal with, and I

28   think it would be totally inappropriate to strike the prior conviction."  *Id.*

**United States District Court**
For the Northern District of California

1     Because the sentencing court's findings in support of the denial of the

2   *Romero* motion were specific and based on the judge's own observations as well as the

3   briefs and argument of counsel, it is not reasonably likely that the court would have granted

4   the *Romero* motion if it had been filed by former trial counsel at the time of original

5   sentencing.  In the absence of prejudice, Harris fails to raise even a colorable claim of

6   ineffective assistance.  *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (to show

7   prejudice under *Strickland* from failure to file a motion, petitioner must show that (1) had his

8   counsel filed the motion, it is reasonable that the trial court would have granted it as

9   meritorious, and (2) had the motion been granted, it is reasonable that there would have

10   been an outcome more favorable to him).  The court therefore denies relief on the

11   ineffective assistance claim.

**CONCLUSION**

13     For the reasons set forth above, Harris's request for an evidentiary hearing is

14   DENIED and the petition for a writ of habeas corpus is DENIED.  This order fully

15   adjudicates the petition and terminates all pending motions.  The clerk shall close the file.

**CERTIFICATE OF APPEALABILITY**

17     To obtain a certificate of appealability, Harris must make "a substantial showing of

18   the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has

19   rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is

20   straightforward.  "The petitioner must demonstrate that reasonable jurists would find the

21   district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

22   *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a

23   COA to indicate which issues satisfy the COA standard.  Here, the court finds that the

24   following issue presented by Harris in his petition meets that standard: whether his Sixth

25   and Fourteenth Amendment rights to a verdict by impartial, indifferent jurors were violated

26   because one of the jurors was a previous school teacher with whom Harris had problems in

27   school.  Accordingly, the court GRANTS the COA as to that issue.  *See generally Miller-El*,

28   537 U.S. at 322.

The clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**IT IS SO ORDERED.**

Dated: January 7, 2013

PHYLLIS J. HAMILTON
United States District Judge